IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| New York Independent Venue Association; Columbus Ale House, Inc.; Upstate Shows, Inc.; Jayarvee, Inc.; Capitol Enterprises, Inc.; Jukimoo, LLC; Infinity on Main, Inc.; Rapids Theater Niagara Falls USA, Inc.; Turks Group, LLC; 49 Illinois Restaurant, LLC,<br>*Plaintiffs*<br><br>v.<br><br>Vincent G. Bradley, *in his official capacity as Chairman of the New York State Liquor Authority*,<br>*Defendant* | Case No. 20-CV-6870<br><br>**COMPLAINT** |

### INTRODUCTION

1) The food service industry in New York has tirelessly worked, in good faith, to provide as safe of an environment for New Yorkers as possible during the current global pandemic, in accordance with state and federal guidelines.

2) Instead of providing aid to an industry they have rightfully declared "essential," the state has promulgated, and continues to promulgate, a myriad of constantly changing and unworkable rules, regularly fining establishments thousands of dollars at a time for hyper-technical violations that did not exist days earlier.

3) The latest rule promulgated by New York's State Liquor Authority ("SLA") is not just unworkable, it is unconstitutional. This rule prohibits lawfully operating establishments from advertising the entertainment that is lawfully available: to wit, a ban on advertising of music at food service establishments. This constitutes a content-based restriction on free speech.

- 1 -

4)  The New York Independent Venue Association ("NYIVA") is an industry group that represents approximately 100 food service establishments that largely rely on music in order to draw customers. During the pandemic, their members are still following guidelines requiring seating at tables, mandatory food service with alcohol purchases, early closing times, social distancing and mask policies, *etc*.

5)  Despite the fact that coronavirus is not transmitted via sound waves, the SLA just decimated Plaintiffs' already struggling businesses, and Plaintiffs beg the Court for restoration of their right to speak and, hopefully, their ability to generate enough revenue to pay their employees and possibly even some portion of their rent.

## PARTIES

6)  Plaintiff New York Independent Venue Association is an unincorporated trade association whose members are food service establishments in the State of New York that also provide live entertainment such as musical acts, theatrical performances, comedy shows, and the like.

7)  The remaining plaintiffs ("Venue Plaintiffs") are all businesses operating in, and licensed by, the State of New York (and/or its political subdivisions) to sell both food and alcohol for on-premise consumption, and have either been lawfully advertising lawful music bookings at their establishment until the challenged rule, or plan to do so in the immediate future (*i.e.*, in 2020):

    a.  Plaintiff Columbus Ale House, Inc. operates THE GRAHAM at 151 Meserole St., Brooklyn, NY.

    b.  Plaintiff Upstate Shows, Inc. operates UPSTATE CONCERT HALL at 1208 NY-146, Clifton Park, NY.

    c. Plaintiff Jayarvee, Inc. operates BIRDLAND JAZZ CLUB at 315 W. 44th St., New York, NY.

    d. Plaintiff Capitol Enterprises, Inc. operates THE CAPITOL THEATRE at 149 Westchester Ave., Port Chester, NY.

    e. Plaintiff Jukimoo, LLC operates LITTLEFIELD at 635 Sackett Ave., Brooklyn, NY.

    f. Plaintiff Infinity on Main, Inc. operates TRALF MUSIC HALL at 622 Main St.., Buffalo, NY.

    g. Plaintiff Rapid Theater Niagara Falls USA, Inc. operates THE RAPIDS THEATER at 1711 Main St., Niagara Falls, NY.

    h. Plaintiff Turks Group, LLC operates THE SULTAN ROOM & THE TURK'S INN at 234 Starr St., Brooklyn, NY.

    i. Plaintiff 49 Illinois Restaurant, LLC operates BUFFALO IRON WORKS at 49 Illinois St., Buffalo, NY.

8) Defendant Vincent G. Bradley is the Chairman of the SLA. The Chairman is the highest official of the agency and Mr. Bradley is sued in his official capacity.

## JURISDICTION & VENUE

9) Personal jurisdiction is proper because the defendant is the head of an agency of the state in which this federal court sits, and is sued in that capacity. Upon information and belief, Mr. Bradley also lives within the State of New York.

10) Subject matter jurisdiction is proper because the constitutional claims arise under federal constitutional law. *See* 28 U.S.C. § 1331.

11) Subject matter jurisdiction is proper over the state law claim under the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367.

12) Venue is proper because the governmental conduct of which Plaintiffs complain affects businesses (including multiple plaintiffs) within the boundaries of this district.

## ALLEGATIONS OF FACT

### Section I: Overview of the Coronavirus Outbreak

13) Coronavirus is a pathogen first found to be affecting humans at some point in 2019.

14) The first known appearance of the virus was in China, after which it spread both west to Europe and east to the United States.

15) Infections in the United States are first known to have appeared in Washington State in January and then New York in March.

16) Within one month of New York's first case, all 50 states reported infections of coronavirus.

17) It is no surprise that New York City, with its dense population and close contact in its massive public transportation system, became a hotspot of infections.

18) By end of March, New York reported nearly 100,000 infections and over 2,000 deaths, far surpassing any other state and most countries in the world.

19) New York saw its peak of coronavirus deaths on April 7th, 2020, having reported <u>799</u> New Yorkers passed away from the virus on that date.

20) Since then, daily coronavirus deaths in New York have rapidly declined to <u>2</u> reported August 25th, 2020, a 99.75% reduction from peak.

21) A total of approximately 430,000 New Yorkers, or 2.2% of the population, have tested positive for coronavirus as of the date of the docketing of this lawsuit – in addition, of course, to those who are (or were) positive but untested.

## Section II: Effect on the Food Service Industry

22) On March 7th, 2020, the Governor declared a state of emergency relating to the coronavirus outbreak that continues through the date of filing of this complaint.

23) By March 17th, 2020, every food service establishment[1] in the state had been ordered, pursuant to the Governor's emergency powers, to shut its doors to customers, limiting them to takeout and delivery service only (larger venues had been closed days earlier).

24) Over the five months since the mass closure, the state and its political subdivisions have slowly allowed "phased" reopening of many industries, including the food service industry.

25) As of current, establishments in New York City are allowed takeout, delivery, and outdoor dining only: no customers are allowed indoors other than to use bathrooms.

26) As of current, establishments in the remainder of New York State are allowed the same *plus* indoor dining at reduced capacity[2].

27) However, all establishments have been required to comply with a substantial body of new rules, promulgated by the Governor and his administrative agencies, under his purported authorization to do so during a state of emergency.

28) Some of these rules are simple, straight-forward, and common sense: mask requirements, social distancing requirements, hand sanitizer, employee health checks, *etc*.

---

[1] For the remainder of this document, "establishments" refers exclusively to "food service establishments."

[2] Whether indoors or outdoors, capacity is severely reduced due to social distancing minimums (*e.g.*, 6 feet between tables) as well as hard numerical caps (*e.g.*, a percentage of legal fire code capacity).

29) Other rules have been arbitrary, constantly changing, and subject to enforcement before establishments had a chance at compliance, or even required results that were beyond the control of establishments.

30) For example, before the pandemic, food service establishments selling alcohol only needed to *offer* food for sale.  Then, pandemic rules required the sale of some food with every purchase of alcohol.  Then, the Governor announced that full meals were required in order to purchase alcohol, declaring that traditional bar food items like chicken wings "don't count."  Then, the SLA retreated on that, declaring that any foods more substantial than chips and popcorn will suffice.

31) In the meantime, establishments frequently spent tens of thousands of dollars modifying their kitchen, venting, indoor & outdoor seating, menus, promotional materials, staffing, and the like, only to have their expensive modifications prove outdated and futile within days.

32) Establishments that have been found selling alcohol without strict compliance with each and every rule, including government-approved food with each beer, whisky, or cocktail order, have had their liquor licenses suspended, effectively destroying their business.

**Section III: SLA Rule Prohibiting Advertising of Music and Ticketing of Events**

33) All establishments in New York are permitted to have some variety of music playing or being performed inside of their establishments while their patrons are seated indoors (outside the city only) or outdoors (all of the state).

34) Regardless of whether music is playing, all patrons are required to be seated except as necessary to enter, leave, or use the bathroom.

35) Thus, there is no dancing, mingling, or breach of social distancing regardless of whether there is music.

36) Notwithstanding, in the week prior to the filing of this complaint, the SLA has clarified that music may only be "incidental" to the dining experience at any establishment licensed by the state for on-premise consumption of alcohol.

37) That is, they explained, there may be no advertising of anything to do with the music to be found at establishments, nor may there be tickets sold to attend any "shows" at licensed establishments.

38) Licensees who have called the SLA for clarification have been told that "dinner and a show" packages are prohibited, that minimum spends for tables are prohibited, and that virtually any attempt to collect a fee for one's presence at an establishment (as opposed to for the food and drink sold) is now unlawful.

39) To be clear, the SLA rule does not prohibit music, or attending establishments with music events – an order for which they may have been able to demonstrate *some* sort of rationale. The rule prohibits only the *advertising* of the same or the *charging of money* to attend the same.

40) The SLA has not put forth any statements of public health officials, studies, or any other scientific data to demonstrate the expected efficacy or the immediate need to ban the advertising of music or charging of admission prices.

41) The rationality of any such order is called into question by the fact that paying a fee or reading an advertisement does not make one more or less likely to transmit or receive an infectious disease, and that charging a fee makes it *less* likely that one will attend an establishment.

42) In fact, the advertising and ticketing of shows would allow establishments to maintain better control over their limited capacity, allowing them to tell patrons in advance that an evening

is sold out and thus avoiding the gathering of crowds trying to gain admission (and the increased risk of transmission that comes along with such gatherings).

43) Regardless of whether or not there is music, whether or not there is advertising, and whether or not a ticket is sold, patrons are seated, at tables, purchasing food, socially-distanced.

44) Whatever unknown goal the government is attempting to accomplish, there surely must exist far less intrusive means by which the SLA could accomplish it, and the burden is on the government to demonstrate the need for that goal, whether under strict scrutiny (for the content-based restriction on speech) or the "real or substantial relation" test (for the ban on ticketing).

### Section IV: Application & Injury to Plaintiffs

45) The Venue Plaintiffs rely on being able to draw customers and generate revenue by the advertising of music and ticketing of admission to their establishments.

46) As a result of the new rules, the Venue Plaintiffs have been required to cancel, breach, or fail to enjoy the benefits of contractual relationships with music artists, advertising companies, and patrons.

47) Several Venue Plaintiffs had re-opened after being shut down since March for only a few weeks, hosting small, ticketed live music acts in their outdoor spaces with full social distancing (and limited capacity, and meals, and masks, and everything else required of them), and now have cancelled bookings and intends to close its doors once again as a result of the rule.

48) All Venue Plaintiffs all also must stop their advertising for future music and/or admission charges, and expect severe damage to, or destruction of, their businesses.

49) Beyond the named plaintiffs, the majority of NYIVA's members are in the same boat: their businesses cannot operate at even 10% of their normal revenue and remain in compliance with the new rule.

50) Their troubles are aggravated, in many cases, by already being behind on their rent and other bills as a result of being forced to shutter by order of the Governor, and even before the challenged rule was announced, it was expected that 1 in 3 establishments would not survive the pandemic[3].

51) Suffice to say, as a result of the new rules, the Venue Plaintiffs reasonably expect that their revenues may drop to the point that they will be required to permanently close their doors.

## CLAIMS FOR RELIEF

### Count 1 – First & Fourteenth Amendment to the U.S. Constitution
### *Freedom of Speech: The Advertising Ban*

52) The Free Speech clause of the First Amendment to the U.S. Constitution, as incorporated against the states by the Fourteenth Amendment, severely limits the government's ability to restrict the speech of its citizens.

53) Truthful advertisements of lawful goods and services are First Amendment-protected free speech.

54) In banning the Venue Plaintiffs from making such advertisements, the SLA has created a content-based restriction on their free speech.

---

[3] CNBC. "One in three New York restaurants won't open after the pandemic…" https://www.cnbc.com/2020/08/14/the-fat-radishs-unlucky-cohort-1-in-3-ny-restaurants-wont-open-post-pandemic.html (Retrieved August 23rd, 2020)

55) This restriction seems entirely irrational, but in any event is not narrowly tailored to serve a compelling government interest.

56) The SLA, through Defendant Bradley, has therefore infringed upon the Plaintiffs' free speech rights under the First and Fourteenth Amendments to the U.S. Constitution.

## Count 2 –Fifth/Fourteenth Amendment to the U.S. Constitution

### *Substantive Due Process: The Ticketing Ban*

57) The Due Process clauses of the Fifth Amendment to the U.S. Constitution, as incorporated against the states by the Fourteenth Amendment, and the due process required by the Fourteenth Amendment itself, prohibit the arbitrary curtailment of the right of the Venue Plaintiffs to contract or pay or receive payment for lawful goods and services with its customers, artists, and advertising platforms.

58) The Constitution allows for curtailment of this right, in the context of protection of public health, only if there is a "real or substantial relation" between the goal and the restriction. *Jacobson v. Massachusetts*, 197 U.S. 11, 31 (1905).

59) There is little or no discernable public health benefit to preventing the advertising of music that an establishment may lawfully have, or charging money to enter an establishment, given that the state has already set capacity limits that it deems are safe, as well as the requirement of table seating at all times.

60) On the other hand, these rules threaten to cause the permanent destruction of the Venue Plaintiffs, a severe interference with their constitutional rights.

61) The SLA, through Defendant Bradley, has therefore infringed upon Plaintiffs' substantive due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution.

### **Count 3 – New York "Article 78" Review**

*__Arbitrary & Capricious Action by a New York Governmental Body: The Ticketing Ban__*

62) Article 78 of the New York Civil Practice Law & Rules prohibit agencies of the state from taking actions that are "arbitrary and capricious or an abuse of discretion." N.Y. CPLR § 7803(3).

63) The decision that establishment may no longer charge for entering their establishment is wholly unrelated to any rational attempt to control the coronavirus pandemic, and is therefore arbitrary.

64) The random timing of the decision – 5 months into the pandemic – and with no negative change in circumstance that would justify a deviation from existing practice, makes the decision capricious.

65) Implementing the rule without any explanation, solicitation of industry or public feedback, or evidence that the rule needed rapid implementation because of a *new* emergency, not to mention in the absence of legislative direction, was an abuse of discretion.

66) The Court should therefore annul the rule pursuant to N.Y. CPLR § 7806.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

i. Declaratory relief stating that the SLA's advertising ban discussed herein is facially unconstitutional.

ii. Declaratory relief stating that the SLA's ticketing ban discussed herein is facially unconstitutional.

iii. Annulment of the SLA's ticketing ban pursuant to Article 78.

iv. Injunctive relief ordering that Defendant Bradley and his agents be restrained from enforcing the unconstitutional rules discussed herein and restrained from issuing substantially-similar orders.

v. Cost of the action.

vi. Reasonable attorney's fees.

vii. Any other such relief as the Court deems appropriate.


Dated: New York, NY

August 25th, 2020

Respectfully submitted,

_____/s/_____
Jonathan Corbett, Esq.
Attorney for Plaintiffs (*pro hac vice* pending)
CA Bar #325608
958 N. Western Ave. #765
Hollywood, CA 90029
E-mail: jon@corbettrights.com
Phone: (310) 684-3870
FAX:  (310) 684-3870